# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **MEADOWCRAFT, INC.,** | ) | Case No. 09-10988 (BLS) |
| | ) | |
| Debtor. | ) | |

**UNSWORN DECLARATION PURSUANT TO 28 U.S.C. §1746(2) AND FED.R.CIV.P. 43(e), AS INCORPORATED BY FED.R.BANKR.P. 9017, OF TIMOTHY M. LEROY IN <u>SUPPORT OF FIRST DAY MOTIONS</u>**

I, Timothy M. Le Roy, of full age, declare as follows:

1. I am the Executive Vice President of Meadowcraft, Inc., the debtor and debtor in possession in the above captioned Chapter 11 case (the "Debtor" or "Meadowcraft"). In my capacity as Executive Vice President of the Debtor, I have assumed certain responsibilities for the restructuring efforts of the Debtor. I have been authorized by written consent by a majority of the board of directors and the members of the Debtor to submit this declaration (the "Declaration")

2. On March 20, 2009, (the "Petition Date") an involuntary petition (the "Involuntary Petition") pursuant to 11 U.S.C. §303, was filed against Meadowcraft by petitioning creditors Wells Fargo Bank, NA, RZB Finance LLC and Burdale Financial Limited (the "Petitioning Creditors") seeking entry of an order for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. Subsequently, the Debtor consented to its case being converted to a proceeding for reorganization under Chapter 11 of the Bankruptcy Code.

4. The Debtor continues to operate its business as debtor in possession pursuant to § 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a

trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

5. I am advised by counsel that this Court has jurisdiction over this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to 28 U.S.C. §§ 1408 and 1409.

6. Meadowcraft, Inc., a Delaware corporation, is a leading domestic maker of casual outdoor furniture and the largest manufacturer of outdoor wrought-iron furniture in the United States. Other Meadowcraft products, all of which are designed and distributed by the company, include a variety of wrought-iron indoor furniture and both indoor and outdoor wrought-iron accessories, outdoor cushions, umbrellas, and wrought-iron garden products. Meadowcraft's customers are mass merchandisers and specialty stores, retailers Wal-Mart, Lowe's and Home Depot among the most notable, primarily in the United States.

7. Meadowcraft traces its history to the early 20th-century founding of the Birmingham Ornamental Iron Co., in Birmingham, Alabama, by B. M. Meadow. The fledgling operation began fashioning such ornamental iron products as decorative fencing and gates for Birmingham residences and businesses. Over the years, the company diversified its iron product offerings and its customer base, producing a variety of iron products for local business facilities.

8. During World War II, Birmingham Ornamental Iron (BOI) began manufacturing a line of metal furniture, in part to offset seasonal drops in revenues it experienced given its dependence on the construction industry. They found a ready, if unlikely, customer in electronics giant Philco, which had been diversifying its interests during the war. From 1946 to 1948 Philco

marketed and sold Meadowcraft furniture, named for the founder of BOI, but dropped the line when demand for Philco electronics products resumed following the war.

9. By the early 1950s, the company's furniture line was languishing and facing steep financial losses. Moreover, BOI had warehoused thousands of tons of metal for use in its furniture; further losses would ensue if that inventory had to be sold as scrap. The problem was met by the company's vice-president, general manager, and treasurer William McTyeire Jr. McTyeire, an engineering grad and enthusiastic salesperson as well, decided to turn the furniture operations around. By the late 1950s, the company was ranked third in the United States in wrought iron furniture sales and was first in the South. The iron works' sales surpassed $3 million in 1957, over one-third of which was generated by its Meadowcraft furniture line. Still, the iron works' primary business was in manufacturing the miscellaneous and ornamental metal products.

10. By 1967, when the company was employing a work force of 259 and the founder's descendant Evelyn Meadow was serving as chairman, BOI had grown into a collection of consolidated furniture and housewares makers, still based in Birmingham. In 1985, these manufacturers were incorporated as Meadowcraft, with Samuel R. Blount as the new concern's chairman. The popularity of Meadowcraft furniture was rekindled during this time, when retail giant Wal-Mart began offering outdoor furniture at its stores, including the company's lines of chairs, tables, and benches. The Meadowcraft products proved popular and regularly sold out.

11. By the mid-1980's Meadowcraft was offering consumers a wide variety of products in three markets: the outdoor mass market under the Plantation Patterns brand name; the outdoor specialty market under the Meadowcraft, Arlington House, and Salterini brand names; and the indoor specialty and mass markets under the Interior Images by Salterini and Home

Collection from Plantation Patterns brand names, respectively. Outdoor products sold through mass merchandisers under the Plantation Patterns name included dining groups composed of action chairs, stack chairs, dining tables, bistro groups, and accent tables; accessories such as chaises, gliders, bakers' racks, and tea carts; cushions and umbrellas; and garden products. Outdoor products for the specialty market were similar. The company's outdoor furniture products came in a variety of styles and colors and were being sold at different prices to appeal to a range of consumers. The indoor collections, all in wrought iron, included occasional tables, dining groups and beds, and accent pieces. The garden products included shepherds' hooks, trellises, arbors, and plant stands. Meadowcraft was serving the outdoor mass market, including national chains, discount retailers, mass merchants, and home centers; the outdoor specialty market, including furniture stores, specialty stores, and garden shops; and the indoor market, including specialty furniture stores, mass merchandisers, and department stores. In fiscal 1998, the company sold products to more than 1,500 mass and specialty accounts, including nine of the top ten U.S. discount retailers/mass merchants and home centers. Typically, by early fall of each year, Meadowcraft received estimated requirements from customers for about 70 percent of the sales that it would produce and ship during the following selling season.

12. When Bill McCanna took over the presidency of Meadowcraft in 1991, his focus was on quality-control particularly as it pertained to designing, producing, and shipping on a reliable, timely, and cost-effective basis. McCanna, who came to Meadowcraft after two decades of running manufacturing plants for Fortune 500 companies, made modernizing the firm's distribution his first order of business. At the time, the company had been overseeing about ten warehouses scattered around Birmingham, with crews wandering around them searching for the furniture needed to fill orders. A new, better organized system would be in place by mid-decade.

13. In the early 1990s Meadowcraft's factory sale at Wal-Mart's flagship store in Bentonville, Arkansas, reportedly sold more wrought-iron furniture in 32 days than the Wal-Mart chain sometimes sold during an entire outdoor-furniture selling season. For Wal-Mart "it was a real eye-opener," according to Blount, and impelled the giant chain to increase its orders from Meadowcraft. Meadowcraft added indoor wrought-iron furniture to its products in the early 1990s. The company reported net income of $2.8 million in 1993 on net sales of $73.1 million. This increased to $6.4 million on net sales of $96.2 million in 1994 and $10 million on net sales of $120.8 million in 1995.

14. In 1994 Meadowcraft added a 660,000-square-foot manufacturing and distribution facility to its existing operation in Wadley, Alabama. The company also completed a 500,000-square-foot distribution center on Birmingham's Carson Road in early 1995 and a 160,000-square-foot addition to that center later in the year. This facility was adjacent to the company's newest expansion, a 350,000-square-foot factory near company offices off Pinson Valley Parkway. A smaller factory/warehouse at the company's Selma, Alabama, plant was also under construction in 1995. The $30-million Pinson Valley plant, located in Valley East Industrial Park, was completed in late 1995. The company also was leasing a 240,000-square-foot plant and corporate headquarters on Meadowcraft Road and a 340,000-square-foot distribution center on Goodrich Drive. Both were about a half-mile from the Carson Road/Pinson Valley facilities.

15. Since the turn of the century, Meadowcraft has worked to redefine itself in an ever changing market and despite the onslaught of the "Chinese Competitors" as it has worked to reposition itself in the market place. The change in the average US Consumers willingness; in the

seasonal years starting in 2002, to create an outdoor oasis in their backyard has lead to the remarketing of the Meadowcraft Brand complimented by its Visions Collections and the expanding of the mass market into price points and styled goods that were simply not available in the Mass Market just 3 years prior. Plantation Patterns Mass Market furniture is no longer limited to opening price point business as the trends in the US continue to change the overall retail landscape.

16. Unfortunately for Meadowcraft, the confluence of a number of factors, including, but not limited to, the deteriorating housing and overall economy resulted in the company consenting to the entry of an order for relief and the commencement of this Chapter 11 case.

17. As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtor's executives, and discussions with outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in its first day motions and applications, (b) the need for the Debtor to continue to operate effectively, and (c) the deleterious effects upon the Debtor of not obtaining such relief.

18. I submit this Declaration in support of the Debtor's first day motions and applications filed with the Court.

19. I have reviewed each of the first day motions and applications (including the exhibits and schedules attached thereto) and to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon my information and belief and through my review of various materials and other information, as well as my experience and knowledge of the Debtor's operations and financial condition. If I were called

- 6 -

CH01/ 25321469.1

seasonal years starting in 2002, to create an outdoor oasis in their backyard has lead to the remarketing of the Meadowcraft Brand complimented by its Visions Collections and the expanding of the mass market into price points and styled goods that were simply not available in the Mass Market just 3 years prior. Plantation Patterns Mass Market furniture is no longer limited to opening price point business as the trends in the US continue to change the overall retail landscape.

16. Unfortunately for Meadowcraft, the confluence of a number of factors, including, but not limited to, the deteriorating housing and overall economy resulted in the company consenting to the entry of an order for relief and the commencement of this Chapter 11 case.

17. As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtor's executives, and discussions with outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in its first day motions and applications, (b) the need for the Debtor to continue to operate effectively, and (c) the deleterious effects upon the Debtor of not obtaining such relief.

18. I submit this Declaration in support of the Debtor's first day motions and applications filed with the Court.

19. I have reviewed each of the first day motions and applications (including the exhibits and schedules attached thereto) and to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon my information and belief and through my review of various materials and other information, as well as my experience and knowledge of the Debtor's operations and financial condition. If I were called

upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the first day motions and applications.

20. The relief sought in the first day motions and applications will minimize the adverse effects of the instant Chapter 11 case on the Debtor and ensure that the Debtor transitions smoothly into this bankruptcy case. I believe that the relief sought in each of the first day motions and applications is necessary to prevent the immediate and irreparable damage to the Debtor's operations and ability to reorganize that would result from a collapse of customer confidence in the Debtor. Accordingly, for the reasons stated herein and in each of the first day motions and applications filed concurrently herewith, I respectfully request that each of the first day motions and applications be granted in their entirety, together with such other and further relief as this Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2009

By:   /s/ Timothy M. LeRoy<br>
     Timothy M. Le Roy<br>
     Executive Vice President